**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN BLOCKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:10cv0298 RWS** |
| | ) | **TCM** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision

of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying John

Blocker ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. § 401-433, and supplemental security income benefits

("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in

support of his complaint; the Commissioner has filed a brief in support of his answer. The

case was referred to the undersigned United States Magistrate Judge for a review and

recommended disposition pursuant to 28 U.S.C. § 636(b).

**Procedural History**

Plaintiff applied for DIB and SSI in December 2006, alleging that he was disabled

as of October 10, 2006, because of diabetes, high blood pressure, alcoholism, pulmonary

embolism, rib pain, back pain, head pain, swollen hands, and depression. (R.[1] at 91-96, 99-102.) His applications were denied initially and after a hearing held in September 2009 before Administrative Law Judge ("ALJ") Christina Young Mein. (Id. at 6-33, 35-40, 42-46, 49-54, 311-25.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Vincent Stock, M.A., testified at the administrative hearing.

Plaintiff testified that he was then 57 years old, 6 feet tall, and weighed 185 pounds. (Id. at 10.) He had lost weight two years earlier. (Id. at 11.) He is married; his wife does not work. (Id.) They live in an apartment. (Id. at 22.) He has a General Equivalency Degree (GED). (Id. at 12.)

His driver's license was suspended after he forgot to pay a 2006 speeding ticket he received in Arkansas. (Id. at 11-12.)

Plaintiff worked "a couple of days" in 2008 for a temporary employment agency. (Id. at 12.) His last regular job was as a maintenance technician. (Id. at 13.) He had held this job for four years. (Id.) He had also worked as a parking supervisor, from 1997 to 2002, and as a truck driver, from 1989 to 1997. (Id. at 14, 15.) He stopped work as a truck driver because of his diabetes and pulmonary embolism. (Id. at 15.) He was terminated from his

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

- 2 -

job as a maintenance technician because he was no longer needed, having been replaced while he was on vacation. (<u>Id.</u>) He had requested additional time off because he was depressed and feeling overworked. (<u>Id.</u> at 23-24.) His depression did not get better. (<u>Id.</u> at 24.) Also, his employer had wanted him to see another doctor, but that doctor refused to treat him until he had seen his own doctor. (<u>Id.</u>) Additionally, Plaintiff testified that he feels "pushed aside" by the current economic situation and cannot cope with it. (<u>Id.</u> at 24-25.)

Asked what limits his ability to work, Plaintiff explained that he is "an emotional wreck." (<u>Id.</u> at 16.) He has problems concentrating. (<u>Id.</u>) He loses focus when he reads the newspaper. (<u>Id.</u>) He cannot remember what an hour-long television program was about. (<u>Id.</u> at 16-17.) He does not attend meetings or clubs or church. (<u>Id.</u> at 17.) His daughter takes him grocery shopping. (<u>Id.</u>) Before 2006, he was in a bowling league, took his kids to the zoo, and went out to dinner with his wife. (<u>Id.</u> at 26.)

He has problems with arthritis in his back. (<u>Id.</u> at 17.) He last had a drink in 2007. (<u>Id.</u>) Also, his vision is sporadic. (<u>Id.</u> at 19.)

He is being treated by Dr. Gonzalez for depression, and takes Seroquel and Celexa daily. (<u>Id.</u> at 18.) He also takes medication for his high blood pressure and diabetes. (<u>Id.</u> at 18-19.) His medications give him constant headaches. (<u>Id.</u> at 19.) Medication does help control his high blood pressure and diabetes. (<u>Id.</u>)

During an eight-hour period, Plaintiff will walk three to four hours, stand for one, and sit for six to seven. (<u>Id.</u> at 20.) He can lift a maximum of twenty-five pounds. (<u>Id.</u>) He can

climb fifteen stairs at most.  (Id.)  He sleeps two or three hours at a time.  (Id.)  He does not have any problems taking care of his personal grooming, e.g., showering or shaving.  (Id. at 21.)

Asked to describe a typical day, Plaintiff testified that he gets up around 6:00 a.m., attends to his personal needs, helps his wife fix something to eat, watches a little television, and then naps for approximately thirty minutes.  (Id.)  His wife makes lunch.  (Id.)  He goes outside in the afternoon and sometimes takes a walk.  (Id. at 21-22.)  He helps his wife with the laundry and cleaning.  (Id. at 22.)  If his grandchildren are present, he helps his wife with their care.  (Id.)

Every three months, he sees a counselor.  (Id. at 24.)  He is on Medicaid.  (Id.)  Every two or three days, he has a crying spell.  (Id. at 25.)  He has no energy and has difficulty starting or maintaining anything.  (Id. at 26.)  It is hard for him to get up in the morning and, when he does, he feels just as bad as when he went to bed.  (Id.)

Vincent Stock testified as a vocational expert (VE).  He classified Plaintiff's job as a maintenance technician as heavy, as a parking supervisor as light, and as a truck driver as heavy.  (Id. at 28.)  All were medium.  (Id.)  None included any transferable skills.  (Id.)

Asked if Plaintiff's past work could be performed by someone of Plaintiff's age and education, with his work experience, capable of the exertional demands of the full range of medium work,[2] but limited to work with one to two step instructions, no contact with the

---

[2]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds."  20 C.F.R. § 404.1567(c).  If someone can do medium work, he can do sedentary or light work.  Id.

public, and only occasional contact with coworkers and supervisors, the VE replied that he could not.  (Id. at 29.)  Such a person could, however, work as an industrial cleaner, janitor, and assembler, all of which jobs existed in significant numbers in the state and national economies.  (Id. at 30.)

If such person could perform the exertional demands of the full range of light work[3] but otherwise had the same limitations, that person could work as a housekeeper or in a masker/semiconductor position.  (Id. at 30-31.)  These jobs also existed in significant numbers in the state and national economies.  (Id. at 31.)  The VE stated that his testimony was consistent with the Dictionary of Occupational Titles (DOT).  (Id.)

If this hypothetical person had problems maintaining attention and concentration, would lose his ability to focus throughout the day, and would have occasional crying spells that prevented him from performing the job, all of which meant that he would be "off task" one-third to one-half the day, that person would be unemployable because it would be unreasonable for an employer to accommodate the necessary breaks.  (Id. at 32.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from various health care providers, and the evaluations of examining and non-examining consultants.

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

When applying for DIB and SSI, Plaintiff completed two Disability Reports. (Id. at 122-29, 153-60.) In one, he listed his height as 6 feet tall and his weight as 178 pounds. (Id. at 122.) His ability to work is limited by diabetes, high blood pressure, pulmonary embolism, mental problems, and pain in his ribs, back, and head. (Id. at 123.) These impairments limit his ability to work by making him very agitated, causing him back pain, and causing him to have trouble focusing, following instructions, and performing his duties. (Id.) These impairments first bothered him on May 1, 2006, and stopped him from working as of October 10, 2006, when he could no longer handle the stress or the intense back pain. (Id.) He had completed two years of college. (Id. at 128.) He also had had special training as a truck driver. (Id.) In the other report, he listed his weight as 160 pounds. (Id. at 153.) He also reported that his diabetes, high blood pressure, and "overall physical condition" limit his abilities to lift, carry, stand, and walk. (Id. at 154.) These impairments first interfered with his ability to work on May 28, 2006, and stopped him from working as of October 31, 2006. (Id.) His medications included Citalopram and Seroquel for depression, Lisinopral for high blood pressure, and Trazodone for chronic pain. (Id. at 158.)

In a form titled "Missouri's Supplemental Questionnaire," Plaintiff described the symptoms that keep him from working as constant headaches, loss of feeling in his hands, periods of weakness and fatigue, blurred vision, and pain in his hands, lower back, and shoulders. (Id. at 178.) His symptoms are made worse by repetitive motion, lifting, bending, standing for long periods of time, and loud noise. (Id.) He is able to do household chores, but forgets to remove clothes from the machines when doing laundry. (Id. at 181.)

Once a month he goes shopping for approximately one hour.  (Id.)  The meals he prepares are frozen dinners and canned soups.  (Id.)  He no longer has the patience to prepare home-cooked meals.  (Id.)  He has difficulty sleeping because of his depression.  (Id. at 182.)  These changes occurred approximately eighteen months ago.  (Id.)  He does not have any hobbies or engage in any activities because of his depression.  (Id.)  On an average day, he drinks coffee for the first part of the day and tries to help his wife with the chores.  (Id.)  Most of the time he worries.  (Id.)  He cannot concentrate for long enough to watch a thirty-minute television show or to read.  (Id.)  He can, but does not, drive.  (Id. at 183.)  He gets out of the house every day for two to three hours.  (Id.)  His inability to concentrate makes it difficult for him to follow written or verbal instructions.  (Id. at 184.)  He has problems getting along with other people because his anxiety and depression is misunderstood.  (Id.)

A Function Report was completed on Plaintiff's behalf by his wife.  (Id. at 186-94.)  She has known Plaintiff for twenty-seven years.  (Id. at 186.)  They live in a house.  (Id.)  He cares for her and their grandchildren, and tries to provide for their daily needs.  (Id. at 187.)  Her family and his brother also help them with food, transportation, and money.  (Id.)  His sleep is disturbed by restlessness, depression, and anxiety.  (Id.)  He has no problem with personal grooming tasks, although he sometimes has to be reminded to do these things.  (Id. at 187-88.)  He makes coffee and prepares, with her help, soups and frozen dinners.  (Id. at 188.)  He only wants to eat once a day.  (Id.)  His interests include watching sports on television and doing some fishing.  (Id. at 190.)  He is becoming more and more disinterested in these activities.  (Id.)  He visits family members at their houses and attends

church, community centers, and social events. (Id.) There is, however, a lot of misunderstanding and arguments with family members and friends. (Id.) His impairments affect his ability to lift, sit, climb stairs, understand, squat, kneel, bend, use his hands, follow instructions, see, complete tasks, remember, concentrate, and get along with others. (Id. at 191.) They do not affect his ability to talk, stand, hear, reach, or walk. (Id.) His depression and anxiety have caused a lack of will in him. (Id.) He cannot walk longer than one-half mile without having to stop and rest for five minutes. (Id.) He daydreams and cannot pay attention for long. (Id.) He cannot focus very well. (Id.) Because of his impairments, he does not get along well with authority figures. (Id.) He was laid off from his last job because of his impairments. (Id. at 192.) He does not handle stress or changes in routine well. (Id.)

After the initial denial of his applications, Plaintiff completed a Disability Report – Appeal form. (Id. at 198-210.) Since he had completed the initial reports, there had been no changes in his impairments. (Id. at 198.)

Plaintiff had reported annual earnings from 1967 to 1979, 1982 to 1995, and 1997 to 2006.[4] (Id. at 104.) His highest earnings were in the period from 1999 to 2006, inclusive, and averaged $20,049 per year. (Id.)

The medical records before the ALJ begin the month of his alleged disability onset date and are summarized below.

---

[4]A prior DIB application had been denied at the initial stages in June 1995 and another had been denied in July 1997 after a hearing. (Id. at 120, 151.)

On October 26, 2006, Plaintiff went to the St. Louis University Health Sciences Center to establish care. (Id. at 215-227, 230-42.[5]) His major problems were hypertension, diabetes mellitus, and depression. (Id. at 224.) On a Health History Questionnaire, Plaintiff listed a hospitalization in February 1995, when he was diagnosed with diabetes and pulmonary embolism, and June 1995, when he was injured in a truck accident. (Id. at 215-22.) His major health concerns were diabetes, high blood pressure, and depression. (Id. at 215.) He drank four to five cups of coffee and two colas per day. (Id. at 218.) He walked for exercise, surfed the Internet for relaxation, and renovated houses for a hobby.[6] (Id.) He smoked one pack of cigarettes a day. (Id. at 219.) He did not drink alcohol. (Id.) He had traveled throughout the country. (Id.) He had been involved in a violent confrontation. (Id.) His symptoms included shortness of breath with exertion and leg sores that would not heal. (Id. at 220.) He had problems with itching. (Id.) He reported that he had had no medical treatment for the past two to three years. (Id. at 223.) He had gone to the emergency room the day before and had been seen by a psychiatrist. (Id.) He had had "many family/work stresses since July." (Id.) He did not have chest pain, shortness of breath, nausea, vomiting, fever, chills, diarrhea, or urinary problems. (Id.) He got up once a night to urinate. (Id. at 220.) On examination, Plaintiff was in no apparent distress; however, his high blood pressure had been poorly controlled the past few years. (Id. at

---

[5]Pages 230 to 242 are duplicates.

[6]Plaintiff testified at the hearing that he had stopped renovating houses when he started work as a maintenance technician. (Id.)

223.)  He was given glucose monitoring supplies and was to check his glucose levels twice a day before being referred to a dietician and an ophthalmologist.  (Id.)  He was to follow up with a psychiatrist for his depression and was started on a medication for his high blood pressure.  (Id.)  His cholesterol levels were good;  his blood sugar levels were normal.  (Id. at 225-26.)  He was to return in one to two months and be followed by Barry Mossman, M.D.  (Id. at 224.)

On October 31, Dr. Mossman released Plaintiff to return to work immediately with no restrictions.  (Id. at 229.)

On June 6, 2007, an intake assessment of Plaintiff was completed by a registered nurse with the St. Louis County Department of Medicine.  (Id. at 267-68.)  Plaintiff was not on any medications and had no insurance, Medicare, or Medicaid.  (Id. at 267.)  He had no psychiatric history and no current limitations.  (Id.)  His medical history included only diabetes mellitus and hypertension.  (Id.)  The former was described as controlled; the latter as benign.  (Id. at 263, 264.)

In January 2009, Plaintiff completed an intake assessment for Hopewell Center, Inc. (the Center).  (Id. at 296-301.)  He had been referred to the Center by his attorney.  (Id. at 301.)  He reported that he was depressed, sleeping and eating poorly, and experiencing auditory and tactile hallucinations.  (Id. at 296.)  He had previously had psychiatric care from Dr. Smith at the Comprehensive Health Center and at Wohl Clinic.[7]  (Id. at 297.)  His medical problems included hypertension and diabetes.  (Id. at 298.)  His interests included

---

[7]No records from either provider were before the ALJ.

fishing.  (Id.)  His assets included being cooperative and compliant with medications.  (Id.)

He had a history of alcohol abuse.  (Id.)  On examination, he was alert, cooperative,

appropriately groomed, and had good eye contact.  (Id. at 299.)  His thought content was

coherent and relevant and without delusions.  (Id.)  His mood was dysphoric[8]; his affect was

blunted.  (Id.)  His recent memory was poor; his remote memory was good.  (Id.)  He was

oriented times three.  (Id.)  His insight and judgment were both fair.  (Id. at 300.)  The

licensed clinical social worker[9] diagnosed Plaintiff with depressive disorder, not otherwise

specified,[10] and evaluated his Global Assessment of Functioning as 43.[11]  (Id.)  The worker

noted that Plaintiff had recently been prescribed Paxil, an anti-depressant, by Dr. Smith.  (Id.

---

[8]Dysphoria is "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort."  Stedman's Medical Dictionary, 534 (26th ed. 1995).

[9]The worker's signature is illegible.

[10]According to the *Diagnostic and Statistical Manual of Mental Disorders* 4 (4th ed. Text Revision 2000) (DSM-IV-TR), each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

[11]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

at 301.)  Plaintiff was scheduled for a psychiatric evaluation and follow-up.  (Id.)  A Medicaid application was taken on his behalf.  (Id.)

On April 20, Plaintiff was evaluated, at his attorney's request, at the Center by Alicia D. Gonzalez, M.D.  (Id. at 303-10.)  He reported that he had recently started drinking alcohol again.  (Id. at 303.)  He was appropriately dressed, coherent, and relevant, but was slow in his responses, had a sad facial expression, and reported being depressed and occasionally having suicidal thoughts.  (Id.)  He heard voices which told him to "'get even.'" (Id.)  He had angry outbursts and was argumentative with his wife.  (Id.)  He was not, however, abusive.  (Id. at 304.)  His memory was "somewhat impaired," but he was well oriented.  (Id.)  Dr. Gonzalez diagnosed him with alcohol dependence and major depressive disorder recurrent.  (Id.)  She assessed his GAF as 45.[12]  (Id.)  He was prescribed Celexa, to be taken in the morning, and Seroquel, to be taken at bedtime.  (Id. at 302, 304, 305.)

Four months later, Dr. Gonzalez completed a Mental Residual Capacity Questionnaire on behalf of Plaintiff.  (Id. at 306-10.)  She reported that she was treating Plaintiff every three months, beginning with his April 20 visit.  (Id. at 306.)  Of sixteen abilities listed under the category of Mental Abilities and Aptitudes Needed to do Unskilled Work, she rated Plaintiff as "[l]imited but satisfactory" in all but three.  (Id. at 307.)  She rated him as "[s]eriously limited but not precluded"[13] in those three:  complete a normal

---

[12]See id.

[13]The next more restrictive limitation was described as "[u]nable to meet competitive standards."

work day and work week without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; and deal with normal work stress. (Id.) Although the form requested that a serious limitation be explained and that the medical/clinical findings supporting the limitation be included, Dr. Gonzalez did not complete this portion of the form. (Id. at 308.) In the category of Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work, she rated Plaintiff as "[l]imited but satisfactory" in three of the four abilities. (Id.) He was seriously limited in his ability to deal with the stress of semiskilled and skilled work. (Id.) Again, no explanation or supporting findings were included. (Id.) She rated Plaintiff as "[l]imited but satisfactory" in all five of the abilities listed under the category of Mental Abilities and Aptitudes Needed to do Particular Types of Jobs. (Id.) Dr. Gonzalez checkmarked "Yes" when asked if the psychiatric condition exacerbated Plaintiff's pain or other physical symptoms. (Id. at 309.) She did not, however, explain her conclusion as asked. (Id.) She also checkmarked "Yes" when asked if Plaintiff's impairment had lasted, or could be expected to last, twelve months. (Id.) She checkmarked "No" in response to the question whether he was a malingerer. (Id.) She did not respond to the question whether Plaintiff's impairments were reasonably consistent with her evaluation of his symptoms and functional limitations. (Id.)

In addition to Dr. Gonzalez's evaluation, the ALJ had before her other reports of evaluations by examining and non-examining consultants.

Plaintiff underwent a psychiatric evaluation in March 2007 by John S. Rabun, M.D. (Id. at 243-45.) He reported that he had been in "his usual state of mental health until

November of 2006 when he was terminated from his employment and now cannot receive unemployment." (Id. at 243.) He was angry at the lady who had apparently terminated him and wanted to "mess . . . up" his former place of employment. (Id.) He further reported that he was being treated for depression by his general physician – he was no longer under the care of a psychiatrist – and taking Trazodone and Citalopram. (Id.) Dr. Rabun noted that the changes described by Plaintiff, i.e., irritability, anger, and being upset at his former employer, were not consistent with depression. (Id.) Plaintiff was irritable, uncooperative, and hostile. (Id.) "He refused to state the date, who the president currently [was], or even try and recite the months of the years in reverse order." (Id.) His responses were either that he did not care or that he did not remember, although "it was clear that he did remember, but was merely obstinate and defiant." (Id. at 243-44.) When discussing problems he had when employed, he was occasionally loud. (Id. at 244.) He did not describe any suicidal ideas, any changes in appetite, energy, or sleep, or any hallucinations or delusions. (Id.) Rather, he said he was not crazy and had not been under any psychiatric care before November 2006. (Id.) On examination, he rarely made eye contact, showed no changes in psychomotor activity, was able to focus and concentrate on the questions, although he refused to participate in formal testing, and was obstinate and defiant throughout the interview. (Id.) His flow of thought was logical, sequential, and goal-directed; "[h]is speech was adequately modulated in rate and tone, until he was angry, and then he would speak loud[ly] and rapidly"; his affect was restricted. (Id.) His thought content was consistent with an adjustment disorder caused by his employment being terminated. (Id.) His

responses to questions suggested that he was oriented and could recall information. (Id.) His apologized at the end of the interview for his inappropriate anger. (Id.) Dr. Rabun diagnosed Plaintiff with an adjustment disorder, with disturbance of conduct, and rated his GAF as 70.[14] (Id. at 245.) He opined that Plaintiff "ha[d] the capacity to focus, concentrate, and remember instructions. He also ha[d] the ability to interact appropriately in a social setting and adapt to changes in a work environment, if he choose[] to do so." (Id.)

The same day, Plaintiff also underwent a physical evaluation by Raymond Leung, M.D. (Id. at 246-50.) His chief complaints were diabetes, hypertension, and low back pain. (Id. at 246.) He was on medication for the first two. (Id.) His blood pressure was usually high. (Id.) He had a pulmonary embolism in 1995, but was currently able to breath okay and was not on any blood thinners. (Id.) He smoked one to two packs of cigarettes a day and occasionally wheezed in the morning. (Id.) He has had low back pain since he was in a motor vehicle accident in 1995. (Id.) He did not use a cane or walker, but did take pain medication. (Id.) He did not know if the medication helped. (Id.) He had also fractured his left ribs in the accident and occasionally has pain in that area. (Id.) He takes ibuprofen for his constant headaches, which he attributes to stress. (Id.) He could walk one block and lift a maximum of twenty pounds. (Id.) He did not use drugs, but did smoke and drink. (Id. at 247.) On examination, he was in no apparent distress; was alert and oriented times three;

---

[14]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

had normal memory and concentration but decreased eye contact; had a normal heart rate and rhythm; had decreased breath sounds but no crackles or wheezes; had a normal gait; was able to walk on his heels and toes and could squat; could bend forward to 90 degrees; had no difficulty getting on and off the examination table or getting up from the chair; had arm, leg, and grip strength of 5/5; had no muscle atrophy; had equal reflexes of 2+; and no cyanosis,[15] clubbing, or edema (swelling) in his extremities.  (Id. at 247-48, 249.)  Plaintiff had a full range of motion in his shoulders, elbows, wrists, legs, hips and spines.  (Id. at 249-50.)  Dr. Leung noted that Plaintiff's lung exam was consistent with chronic obstructive pulmonary disease (COPD) and that he was in no respiratory distress.  (Id. at 248.)

The following month, a psychologist, A. Krescheck, completed a Psychiatric Review Technique (PRT) form for Plaintiff.  (Id. at 251-61.)  She concluded that there was insufficient evidence to determine whether he had a medically determinable mental impairment.  (Id. at 251.)  It was noted that Plaintiff had failed to return the form for describing his activities of daily living – a form needed to assist in assessing his functional limitations.  (Id. at 261.)

In February 2008, Plaintiff underwent another physical evaluation, one by Elbert E. Cason, M.D.  (Id. at 269-75.)  His chief complaints were diabetes, high blood pressure, rash, swollen hands, low back pain, and low rib pain.  (Id. at 269.)  Because of the diabetes, he had polyuria (excessive urination), an excessive thirst, and neuropathy in the feet causing

---

[15]Cyanosis is "[a] dark bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood . . . ."  Stedman's at 425.

numbness.  (Id.)  He checked his blood sugars "about every other day"; they were poorly regulated.  (Id.)  He takes medication for his high blood pressure.  (Id.)  He has no headaches, nephropathy,[16] or history of myocardial infarction or stroke.  (Id.)  His pressure was high; he was told to see his doctor.  (Id.)  He never had a skin rash.  (Id.)  His hands were not swollen then, but occasionally were.  (Id.)  He reported having back pain for the past two years.  (Id. at 270.)  He did not use an assistive device.  (Id.)  He could walk for only one block, stand for thirty minutes, and sit for sixty minutes.  (Id.)  He could lift forty pounds and bend over.  (Id.)  He was not seeing a doctor for his pain.  (Id.)  His ribs had been fractured in 1995 and were still sore.  (Id.)  During an average day, he helped his wife with household chores.  (Id.)  He drove a car, left the house three times a week, and went grocery shopping with his wife.  (Id.)  He did not know the names of his medications.  (Id.) He smoked one-half pack of cigarettes a day and occasionally drank alcohol.  (Id.)  On examination, his lungs were clear to auscultation and percussion.  (Id.)  There were no rales, rhonchi, or wheezes.  (Id.)  There was no pain on compression of his rib cage.  (Id.)  He breathed easily.  (Id.)  He had a full range of motion in his back; straight leg raises[17] were normal.  (Id. at 271.)  He could stand heel and toe; he had a normal gait and station.  (Id.) He had a full range of motion in his shoulders, elbows, wrists, knees, ankles, hips, and

---

[16]"Any disease of the kidney."  Stedman's at 1184.

[17]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

spine.  (Id. at 271, 274-75.)  His grip strengths were normal.  (Id. at 271, 274.)  He appeared alert and oriented times three.  (Id. at 271.)

That same day, Plaintiff also had a psychological evaluation by Lloyd Irwin Moore, Ph.D.  (Id. at 276-80.)  Plaintiff reported that he first had had contact with a mental health profession in 2006 when his employer referred him to a psychiatrist.  (Id. at 278.)  He had been diagnosed with depression the year before, although he had had depression for at least the past eighteen years after his mother died and he had started drinking heavily.  (Id.)  He did not take medication for either his depression or diabetes because he had no insurance.  (Id.)  His appetite was poor.  (Id.)  He had difficulty staying asleep and had had for at least four years.  (Id.)  On a scale from one to ten, with ten being the most intense depression, he rated his depression as an eight.  (Id.)  On examination, his affect was blunted and his mood was dysthymic (depressed).  (Id.)  His speech was normal in both rate and volume; his thought processes and memory were intact.  (Id. at 279.)  He was oriented in all spheres.  (Id.)  He was able to do three out of four mathematical equations correctly and do five digits forward and four backward on immediate recall.  (Id.)  He could interpret proverbs.  (Id.)  His judgment was good; his psychological insight was fair to good.  (Id.)  Because of a lack of insurance and money, he did not take the required medications for his diabetes or depression.  (Id.)  Given his reported history and the interview data, Dr. Moore diagnosed Plaintiff with alcohol dependence in early partial remission, major depressive disorder, and anxiety disorder not otherwise specified.  (Id.)  He assessed Plaintiff's GAF as 50.  (Id. at 280.)  Dr. Moore also summarized Plaintiff's report that he was becoming more isolated and

stayed at home because of his depression and lack of money, he was unable to concentrate because of his depression and physical problems, and he has not been able to work because of his health and depression.  (Id.)

One week after Plaintiff underwent the two evaluations, a second PRT form was completed for Plaintiff by Terry Dunn, Ph.D.  (Id. at 281-91.)  He was described as having an affective disorder, i.e., major depressive disorder; an anxiety disorder, not otherwise specified; a personality disorder; and a substance addiction disorder, i.e., alcohol dependence in early partial remission.  (Id. at 284, 285, 287.)  These disorders resulted in mild restrictions in his activities of daily living, in moderate difficulties in maintaining social functioning and in maintaining concentration persistence, or pace, and in no repeated episodes of decompensation of extended duration.  (Id. at 289.)  Dr. Dunn considered Plaintiff's description of his symptoms to be partially credible.  (Id. at 291.)

Dr. Dunn also completed a Mental Residual Functional Capacity Assessment for Plaintiff.  (Id. at 293-95.)  Of twenty listed mental activities, Plaintiff was not markedly limited in any.  (Id. at 293-94.)  He was moderately limited in his abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors.  (Id.)  He was not significantly limited in the remaining sixteen abilities.  (Id.)

## The ALJ's Decision

After outlining the Commissioner's five-step sequential evaluation process, see pages 23 to 26, below, the ALJ first found that Plaintiff met the insured status requirements through December 31, 2011, and next found that he had not engaged in substantial gainful activity since his alleged onset date of October 31, 2006. (Id. at 315-16.) The ALJ then found that Plaintiff had severe impairments of depressive disorder, alcohol abuse in early remission, high blood pressure, and diabetes. (Id. at 316.) These impairments did not, singly or in combination, meet or medically equal an impairment of listing-level severity. (Id. at 317.) Specifically, his mental impairments did not result in more than mild restrictions in activities of daily living, more than moderate difficulties in social functioning, concentration, persistence, or pace, and in any episodes of decompensation. (Id.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ determined that he has the capacity to perform at least medium work with additional limitations of being able to perform only one to two step instructions, have no contact with the public, and have only occasional contact with coworkers. (Id.) After summarizing Plaintiff's testimony and noting his wife's corroborative report, the ALJ found that Plaintiff's allegation of disability was inconsistent with the medical and other evidence. (Id. at 318-19.) Although his good work record was a positive consideration when evaluating his credibility, it was outweighed by (a) the October 2006 medical records showing a normal glucose level, elevated blood pressure, and a release to work without restrictions; (b) Dr. Leung's evaluation report showing Plaintiff weighed the same as at the hearing, no respiratory distress, a full range of motion in his back, a normal gait, and no prescribed pain

medication; (c) Dr. Rabun's report, including the GAF of 70 and no indication of any functional limitation of a mental nature; (d) the lack of any reported limitations and the presence of normal glucose levels when Plaintiff went to a clinic in June 2007; (e) the lack of any functional limitations placed on him by Dr. Cason; (f) the lack of any medication or other treatment when Plaintiff saw Dr. Moore; and (g) Dr Gonzalez's treatment notes of April 2009 and her form assessment of him in August 2009. (Id. at 319-20.) The ALJ further noted that Plaintiff's diabetes was under control in June 2007, when he last saw a doctor on his own for any physical complaint. (Id. at 320.) Although his blood pressure was less controlled, there was no documented end organ damage or peripheral neuropathy caused by either the diabetes or hypertension. (Id. at 321.) There was no evidence of headaches occurring so frequently that they prevented Plaintiff from maintaining a normal work schedule or resulted in progressive weight loss. (Id.) Indeed, he had not reported any headaches to Dr. Cason. (Id.) Although Dr. Leung thought Plaintiff had COPD, the diagnosis appears nowhere else in the records and Plaintiff had not alleged any such complaint. (Id.) He had, in fact, admitted that he was terminated from his last job for reasons unrelated to his physical complaints. (Id.) The ALJ further noted that no treating or examining doctor had stated or implied that Plaintiff was physically disabled or incapacitated or had imposed any specific long-term limitations on his exertional activities, other than those included in the hypothetical question posed to the VE. (Id.) Rather, Plaintiff had been released to return to work without restrictions. (Id.) He had not sought regular medical attention or treatment, and there was no evidence he had been denied either

- 21 -

because of an inability to pay.  (Id.)  He did have Medicaid.  (Id.)  He did not have most of the signs associated with chronic, severe musculoskeletal pain, e.g., muscle atrophy, did not need any assistive device to stand or walk, and had no documented evidence of nonexertional pain seriously interfering with or diminishing his ability to concentrate.  (Id.)  Although there was evidence that he had an alcohol problem, there was no evidence that the problem was uncontrollable or significantly interfered with his normal, relevant functioning.  (Id.)  Additionally, he did not seek mental health treatment on his own until January 2009, and then it was at the suggestion of his attorney.  (Id.)  Dr. Gonzalez did not say he was unemployable; Dr. Rabun did not place any restrictions on him; and Dr. Moore saw him when he was not being treated.  (Id. at 322.)  The ALJ gave more weight to the GAF of Dr. Rabun than of Drs. Gonzalez and Moore, finding the higher GAF to be more consistent with the record.  (Id.)  The ALJ also found the statement of Plaintiff's wife not to be fully credible on the grounds that, among other things, it was undoubtedly influenced by her affection for him, she was not a disinterested witness, Plaintiff was in an untreated state when she completed the report, and her report was inconsistent with the preponderance of the other evidence.  (Id.)

The ALJ next determined that Plaintiff could not return to past relevant work with his RFC.  (Id. at 322-23.)

With his age, education, and RFC, Plaintiff could perform the jobs described by the VE.  (Id. at 323-24.)  He was not, therefore, disabled within the meaning of the Act.  (Id. at 324.)

**Legal Standards**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n. 3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u> "The sequential evaluation process may be terminated at step two only when the claimant's impairment or

- 23 -

combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's ("RFC"), which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir.

2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "[1] the claimant's daily activities; [2] the duration, frequency, and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness, and side effects of medication; and [5] functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320,  1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity."  20 C.F.R. § 220.130(a).  "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work."  **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).  The Commissioner may meet his burden by eliciting testimony by a vocational expert, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids' . . . ," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability."  **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable

mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting

Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record

to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that

fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188

F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at

1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if

"it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

**Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551

F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as

the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred (1) when assessing his RFC by (a) not giving

appropriate weight to the opinion of his treating psychiatrist, Dr. Gonzalez, (b) not fully and

fairly developing the record, and (c) improperly evaluating his credibility; (2) by not posing

a hypothetical question to the VE that included all the concrete consequences of his

impairments; and (3) by disregarding the inconsistency between the reasoning level required for the jobs cited by the VE and her own assessment of his RFC limiting him to jobs requiring only one to two step instructions.

As noted above, Plaintiff has the burden at step four of establishing his RFC.  See **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004).  On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." **Id.** at 738.  Plaintiff contends that the ALJ did not fulfill her responsibility because she gave too little weight to the favorable medical assessment of Dr. Gonzalez, his treating psychiatrist.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009).  There are six factors to be evaluated when weighing opinions of treating physicians:  (1) the examining relationship; (2) the treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "any factors [the claimant] bring[s] to [the ALJ's] attention" and "the extent to which an acceptable medical source is familiar with the other

information in [the claimant's] case record." 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

According to the record, Dr. Gonzalez saw Plaintiff once for an evaluation before issuing her medical assessment four months later. Thus, consideration of the first two relevant factors, the examining and treatment relationship, does not favor giving Dr. Gonzalez's medical assessment controlling weight. See **Casey v. Astrue**, 503 F.3d 687, 693 (8th Cir. 2007) (affirming ALJ's decision discounting opinion of treating specialist "based on the infrequent nature of the treatment visits").

Neither does consideration of the third and fourth factors, supportability and consistency, favor giving her assessment such weight. Dr. Gonzalez noted when seeing Plaintiff the one time that he had been drinking, was occasionally having suicidal thoughts, reported being depressed and having auditory hallucinations, but was appropriately dressed, coherent, and well oriented. She prescribed two medications. Four months earlier, after an eighteen month hiatus from seeking any medical care, Plaintiff had, also on his attorney's referral, been evaluated by a licensed clinical social worker. At that time, he was alert, cooperative, appropriately groomed, oriented times three, with fair insight and judgment, and with coherent and relevant thought content. Dr. Gonzalez's latter ratings on the assessment forms are inconsistent with hers and the social worker's observations. See **Halverson**, 600 F.3d at 930 (finding ALJ did not err when discounting treating psychiatrist's report that claimant could not maintain consistent employment; although claimant's symptoms "waxed and waned," she was generally "attentive, alert, focused, and appropriate

when examined").  Moreover, the assessment is unexplained, although the form clearly
requests an explanation.  The checklist format of Dr. Gonzalez's assessment and her
incomplete responses limit their evidentiary value.  See **Wildman v. Astrue**, 596 F.3d 959,
964 (8th Cir. 2010) (citing <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001)).

The Court also notes that Dr. Gonzalez saw Plaintiff when he had been drinking.  <u>See</u>
**<u>Id.</u>** at 964-65 (finding that ALJ did not err in not giving treating physician's opinion greater
weight when opinion failed to take into account claimant's failure to abstain from drugs and
alcohol).

Although consideration of the fifth factor, specialization, favors giving Dr. Gonzalez's
assessment greater weight, Plaintiff cites no additional factor not considered by the ALJ that
would fall within the ambit of the sixth factor or that would counteract the negative
conclusions reached after consideration of the first four factors.

In short, Dr. Gonzalez's assessment is based on conclusory opinions that are
unsupported by the record[18] or by her own evaluation notes and were properly discounted.

---

[18]Plaintiff contends Dr. Gonzalez's assessment is only inconsistent with the opinion of Dr.
Rabun, an opinion that was rendered following an evaluation in which Plaintiff was upset and
uncooperative, and that it is consistent with Dr. Moore's report and the social worker's report.  As
noted by the ALJ, however, Dr. Moore saw Plaintiff when he was not being treated.  Moreover,
observations by Dr. Moore that Plaintiff had normal speech in rate and volume, intact thought
processes and memory, orientation in all spheres, good judgment and psychological insight, and the
ability to do three out of four mathematical equations correctly and to interpret proverbs cast doubt
on Plaintiff's subjective reports to him of a depression that was an eight on a ten-point scale.
Additionally, although Plaintiff reported that his depression first bothered him in May 2006, he
informed Dr. Moore that he had been depressed for at least eighteen years.  See **Dipple v. Astrue**,
601 F.3d 833, 836 (8th Cir. 2010) (rejecting claimant's argument that ALJ had failed to give
adequate consideration to consultative report when that report was based on incorrect information
supplied by claimant).  Similarly, the observations of the worker, again made during an examination
done pursuant to Plaintiff's applications, showed him to be alert, with good eye contact,

See **Clevenger v. SSA**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Randolph v. Barnhart**, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the ALJ properly refused to give treating physician's opinion controlling weight when that opinion was in a checklist format and was given after physician had met with claimant only three times); **Hilkemeyer v. Barnhart**, 380 F.3d 441, 446 (8th Cir. 2004) (holding that "the ALJ was justified in rejecting diagnoses of other mental disorders by sources who conducted a single examination of [claimant], and whose conclusions seemed to be based solely upon her subjective complaints").

Plaintiff further argues that the ALJ failed in her duty to recontact Dr. Gonzalez after finding that there were no treatment notes. (Pl. Brief at 12.) Plaintiff misapprehends the ALJ's decision. The ALJ found that Plaintiff had no mental health treatment before January 2009. This is undisputed. Also, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen**, 612 F.3d at 1016 (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff. See e.g. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against

_____

appropriately groomed, cooperative, with coherent and relevant thought content, without delusions, with fair insight and judgment, and orientation times three. These observations are more compelling than Dr. Moore's and the social worker's GAF findings given the Commissioner's indication "that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." **Jones v. Astrue**, 619 F.3d 963, 973-74 (8th Cir. 2010) (internal quotations omitted).

the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

Plaintiff next argues that the ALJ erred when discounting his credibility based on the paucity of treatment. This was, according to Plaintiff, due to his lack of insurance.

A lack of sufficient financial resources to follow prescribed or recommended treatment or to pursue such treatment to remedy a disabling impairment may be "justifiable cause" for such noncompliance. **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004); accord **Clark v. Shalala**, 28 F.3d 828, 831 n.4 (8th Cir. 1994). In order to be such cause, there must be evidence that the claimant was denied medical treatment due to financial reasons. **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005). See also **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Such evidence is lacking in the instant case. Plaintiff did not testify that he sought, and was denied, low cost medical treatment, nor do the medical records refer to any such treatment being denied.[19] The

---

[19]Plaintiff did inform a consulting psychologist, Dr. Moore, that he did not take medication for depression or diabetes because he had no insurance. This explanation was given at a time when there is no record of him being prescribed a medication for either impairment. Also, he informed another doctor the same day that he did not know the name of his medications and did not make any reference to a lack of funds preventing him from purchasing such. And, his most recent glucose level checks had shown his diabetes to be under control and he had informed the health care provider that he had no current psychiatric limitations.

records do indicate that Plaintiff smoked at least one pack of cigarettes a day.  In **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999), the Eighth Circuit Court of Appeals rejected a lack of financial resources as an explanation for the absence of medical treatment or prescription medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."

"Where adequately explained and supported, credibility findings are for the ALJ to make."  **Lowe v. Apfel**, 226 F.3d 969, 971 (8th Cir. 2000).  The ALJ's assessment of Plaintiff's credibility is both.

The ALJ having explicitly discredited Plaintiff's testimony and having "give[n] good reasons for doing so," see **Jones**, 619 F.3d at 975, the Court will defer to that determination.

As noted above, the Commissioner may meet his burden at step five by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997).  "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'"  **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  Plaintiff argues that the ALJ's erroneous RFC

findings led to an improper hypothetical question. Because the ALJ did not err in her findings, as discussed above, this argument is unavailing.

In his final argument, Plaintiff contends that the ALJ erred by disregarding the inconsistency between the reasoning level required for the jobs cited by the VE and her own assessment of his RFC limiting him to jobs requiring only one to two step instructions. Specifically, the DOT defines the jobs of industrial cleaner, janitor, assembler, and masker/semiconductor as requiring a reasoning level of at least two. And, although the job of cleaner/housekeeper requires only a reasoning level of one, that job also requires contact with the public, according to Plaintiff.

"'[W]hen VE testimony conflicts with the DOT, the DOT controls when the DOT classifications are not rebutted.'" **Jones**, 619 F.3d at 978 (quoting Dobbins v. Barnhart, 182 Fed.Appx. 618, 619 (8th Cir. 2006)); accord **Porch**, 115 F.3d at 572; **Montgomery v. Chater**, 69 F.3d 273, 276 (8th Cir. 1995). "The DOT classifications may be rebutted[, however,] with VE testimony which demonstrates specific jobs . . . may be ones that a claimant can perform.'" **Jones**, 619 F.3d at 978 (quoting Dobbins, 182 Fed. Appx. at 619).

In the instant case, the VE listed five jobs which a person limited to, among other things, following one to two step instructions could do and stated that his testimony was consistent with the DOT. Three of the jobs, industrial cleaner (DOT 381.687-018), assembler (DOT 709.684-014), and masker/semiconductor (DOT 726.687-034), have a reasoning level of two. This level is defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." DOT

Appendix C, 1991 WL 688702 (G.P.O. 1991).  A reasoning level three, required for the job of janitor (DOT 382.664-110), is this same ability with the added factor of the instructions alternatively being in a diagrammatic form.  Id.

The ALJ limited the jobs to ones requiring only one to two step instructions.  The VE's testimony that these four jobs could be performed by a person with such restrictions is not directly contradicted by the reasoning levels of the DOT.  "'Because the [VE] specifically limited his opinion to reflect [one to two step instructions only], his testimony was a perfectly acceptable basis for the [ALJ's] conclusions.'"  **Jones**, 619 F.3d at 978 (quoting Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995)).

Alternatively, as noted by the Commissioner, DOT defines the job of cleaner, housekeeping as having a reasoning level of one, i.e., the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions."  DOT, 323.687-014, Cleaner, Housekeeping, 1991 WL 672783 (G.P.O. 1991).  Moreover, this job requires only that the employee "[a]ttend[ ] to the work assignment instructions or orders of supervisor." Id. (classifying "People" function of job as a level eight); DOT, Appendix B, 1991 WL 688701 (G.P.O. 1991) (defining level eight).  It does not, as argued by Plaintiff, require a level of contact with the public or co-workers that is inconsistent with his RFC.  Thus, the VE's testimony about the job of cleaner, housekeeping is consistent with the DOT and supports the ALJ's conclusion that there are jobs that Plaintiff can perform.

**Conclusion**

For the foregoing reasons, the ALJ's decision that Plaintiff is not disabled within the meaning of the Act is supported by substantial evidence on the record as a whole, including that which detracts from the decision, and is not outside the "zone of choice."  See **Heino v. Astrue**, 578 F.3d 873, 879 (8th Cir. 2009).  Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days from this date** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of December, 2010.